Analysis and Decision
1. Police officer's opinion on offensive and defensive wounds.
[¶9.] In the following exchange, defense counsel asked Officer Huemoeller to relate her "training and experience about individuals who end up with scratch marks on their hands[.]"
Officer Huemoeller: It can be either defense wounds or it can be from causing injuries themselves.
Defense Counsel: How would one end up with injuries on their hands from causing injuries to themselves?
Officer Huemoeller: If they were to strike someone, they could cause bruising or scratching to their knuckles.
Defense Counsel: So the scratches and bruising to her hands could be defensive or offensive wounds ?
Officer Huemoeller: Yes.
*125 On redirect examination, counsel for the State enquired:
State: Would you please describe to me what you -- how you would describe defensive wounds ?
Officer Huemoeller: Typically when somebody's being hit in the face, they will block their hands to try to protect their face, whether they're doing it this way (indicating) or this way (indicating).
State: And they sometimes get injuries to their hands trying to defend themselves?
Officer Huemoeller: Yes.
State: And offensive injuries, please describe what you know in your experience about those.
Officer Huemoeller: If someone were to punch something, usually they get bruising or scratch marks along the knuckles. Depending on how flat they hit, they can get them on the knuckles and the fingers as well.
State: Does the skin sometimes split on the knuckles from --
Officer Huemoeller: Yes.
State: -- punching or hitting?
Officer Huemoeller: Sometimes.
State:Did you see any split skin on Ms. Swimmer, Tasina Swimmer, that appeared to be offensive ?
Officer Huemoeller:No .
(Emphasis added.) Defense counsel objected to the last question on foundational grounds. The court overruled the objection. On recross-examination, defense counsel asked Officer Huemoeller whether the scratches and bruises on Tasina's knuckles were "where it would be an offensive wound ?" Officer Huemoeller replied, "Could be."
[¶10.] In Scott's view, Officer Huemoeller's opinion testimony went beyond the range of an average person's experience; therefore, the State was required to establish that the officer was medically or scientifically qualified to give such an opinion. Allowing this testimony was prejudicial, he contends, because it "went to the issue of who may have been the aggressor"-Scott or Tasina. By allowing this opinion, Scott argues, "the trial court's actions incited ... the jury to speculate regarding the opinion that an offensive injury was absent[.]" After all, no one testified about what had happened inside the apartment before Tasina's sisters arrived.
[¶11.] We review a circuit court's evidentiary rulings for abuse of discretion. State v. Buchholtz , 2013 S.D. 96, ¶ 11 n.1, 841 N.W.2d 449, 454 n.1. SDCL chapter 19-19 governs the admission of opinion testimony. Expert opinion requires an adequate foundation based on that witness's "knowledge, skill, experience, training, or education[.]" SDCL 19-19-702. A lay opinion, on the other hand, is "based on the perception of the witness to an event, not the education or experience the witness possesses prior to the event." State v. Condon , 2007 S.D. 124, ¶ 29, 742 N.W.2d 861, 870. A lay "opinion is limited to one that is: (a) Rationally based on the witness's perception; (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702." SDCL 19-19-701.
[¶12.] Judges do not abuse their discretion in allowing counsel on redirect examination to clarify an issue opened up by opposing counsel on cross-examination, even if this evidence might otherwise be inadmissible. United States v. Womochil , 778 F.2d 1311, 1315 (8th Cir. 1985). Perhaps this precept is what the circuit court had in mind in allowing the officer to give her opinion. Yet, in its appellate brief, the State does not contend that defense counsel's *126 questions opened the door to this line of inquiry. Rather, the State believes that all the officer's answers were based on her lay perception of what she observed. While Officer Huemoeller's testimony largely centered on her observations of Tasina's injuries and knowledge of offensive and defensive hand wounds in general, we cannot say the same for the officer's specific opinion that Tasina's hand wounds did not appear to be offensive in nature.
[¶13.] "Offensive wounds" and "defensive wounds" are terms of art developed in forensics to describe injuries incurred by persons either acting as aggressors or acting to protect themselves. State v. Wanatee , 2018 WL 4922976, No. 17-0680, *5 (Iowa Ct. App.). Pathologists and other medical experts are qualified to render opinions on the offensive or defensive nature of wounds ; police officers do not ordinarily give such opinion testimony. Floyd v. State , 569 So.2d 1225, 1232 (Fla. 1990) (medical examiner); State v. Crawford , 344 N.C. 65, 472 S.E.2d 920 (1996) (medical examiner); Campbell v. Coyle , 260 F.3d 531 (6th Cir. 2001) (coroner). In at least one case, however, an officer was permitted to give an opinion "that the victim's wounds were consistent with 'defensive' ones, a conclusion that is beyond the ken of the average layman." Caldwell v. State , 245 Ga.App. 630, 538 S.E.2d 531, 534 (2000). But in that case the officer was a paramedic who had received training on trauma, suicidal behavior, and determining whether wounds were self-inflicted. No comparable credentials were offered here.
[¶14.] In any event, who may be qualified to give this type of opinion testimony must be decided on a case-by-case basis, but here we need not reach the question whether Officer Huemoeller, without foundation, could properly have expressed an opinion on the defensive or offensive nature of Tasina's wounds. For several reasons, we conclude that Scott cannot show that he was prejudiced by this testimony.
[¶15.] Evidentiary rulings will not be overturned unless a defendant suffered material prejudice as a result. State v. Reay , 2009 S.D. 10, ¶ 39, 762 N.W.2d 356, 368. "Material prejudice is established 'when in all probability ... it produced some effect upon the final result and affected the rights of the party assigning it.' " Id. (quoting State v. Krebs , 2006 S.D. 43, ¶ 19, 714 N.W.2d 91, 98 ). To begin with, Officer Huemoeller's opinion was equivocal on whether the nature of the wounds on Tasina's hands were offensive or defensive. At one point, the officer said they were defensive, but on recross-examination she conceded the wounds"[c]ould be" where offensive wounds are located.
[¶16.] Moreover, during trial there was no claim-much less any evidence-that Scott was defending himself, such that Tasina might have incurred offensive wounds to her hands. Defense counsel, in her opening statement, told the jury that Scott "snapped" and "started slapping [Tasina] around." "She has injuries as a result of him slapping her," counsel said, "We're not denying that." These same admissions were repeated in defense counsel's closing argument. In a recorded jailhouse phone call played for the jury, Scott, expressing his regret, can be heard telling Tasina, "I was just out of control. Just drinking, jealousy, anger." With his aggression unchallenged at trial, the claim now that the issue was "who may have been the aggressor" contradicts an uncontradicted record. What was contested throughout the trial was not whether he assaulted his wife, but whether he also assaulted her with a drywall hammer. Thus, whether Tasina incurred offensive wounds to her hands appears wholly irrelevant and nonprejudicial to any issue presented at trial.
*127 2. Fear of imminent serious bodily harm.
[¶17.] Scott next alleges error in the denial of judgments of acquittal on both counts of aggravated assault by physical menace. As to the count concerning Sonia, he argues the State presented no evidence that Sonia was ever in fear. He emphasizes that Sonia pursued him as he continued to try to walk away and that he repeatedly told Sonia to leave him alone. According to Scott, the evidence of his attempt to flee proves he lacked the requisite intent to place Sonia in fear. On the count related to Tasina, Scott argues that the State did not present any evidence that Tasina was ever in fear because she did not testify.
[¶18.] We review the denial of a motion for a judgment of acquittal de novo. State v. Tofani , 2006 S.D. 63, ¶ 24, 719 N.W.2d 391, 398. We "accept [the] evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." State v. Hemminger , 2017 S.D. 77, ¶ 40, 904 N.W.2d 746, 759 (quoting State v. Bucholz , 1999 S.D. 110, ¶ 33, 598 N.W.2d 899, 905 ). "If the evidence, including the circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt[,]" we will not set aside the verdict. State v. Beck , 2010 S.D. 52, ¶ 7, 785 N.W.2d 288 (quoting State v. Carter , 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342 ).
[¶19.] To establish the crime of aggravated assault by physical menace, the State was required to prove: (1) an attempt by Scott to put another in fear of imminent serious bodily harm, (2) by means of physical menace, and (3) with a deadly weapon. See SDCL 22-18-1.1(5). Physical menace "requires more than words: there must be some physical act on the part of the defendant." In re R.L.G. , 2005 S.D. 119, ¶ 10, 707 N.W.2d 258, 261. However, the State need not prove "actual fear of imminent serious bodily harm." State v. LaCroix , 423 N.W.2d 169, 170 (S.D. 1988). Rather, an attempt to put another in fear exists when the defendant does "any act toward the commission of the crime but fails or is prevented or intercepted in the perpetration thereof." R.L.G. , 2005 S.D. 119, ¶ 9, 707 N.W.2d at 261 (quoting State v. Schmiedt , 525 N.W.2d 253, 255 (S.D. 1994) ).
[¶20.] From our review of the record, there was sufficient evidence for the jury to find that Scott used the hammer (a deadly weapon) to attempt to place Sonia in fear of imminent serious bodily harm. Sonia testified that Scott pushed her down to the ground and then raised the hammer above her. Although not necessary to prove the offense, she believed he was going to strike her with the hammer. Oliver similarly testified that when he caught up to Scott and Sonia, he observed Scott standing above Sonia with the hammer raised in the air. Both Oliver and Sonia testified that Oliver's yelling interrupted Scott from actually striking her. This evidence, if believed by the jury, was sufficient to sustain Scott's conviction of aggravated assault by physical menace against Sonia.
[¶21.] Likewise, the State presented sufficient evidence for the jury to find beyond a reasonable doubt that Scott used the hammer to place Tasina in fear of imminent serious bodily harm. Marissa testified that she heard "horrible" screams for help from Tasina outside the apartment. Marissa then found Tasina, bloody and crying, on the apartment floor. Scott was standing over her with the hammer in his hand raised in the air appearing as though he was about to strike her. While Tasina did not testify, the evidence, if believed by the jury along with reasonable inferences drawn therefrom, supports *128 Scott's conviction of aggravated assault by physical menace.
3. Domestic abuse notation.
[¶22.] Lastly, Scott avers violations of due process and jury trial rights because the circuit court noted in the judgment and sentence, without a specific finding by the jury, that his conviction for aggravated assault of Tasina was "domestic," meaning it was a conviction involving domestic abuse. At issue here is whether Scott had a constitutional right to have the jury determine whether his offense was "domestic abuse" because a "domestic" notation subjects a defendant to "costs" under SDCL 25-10-17.1, which he contends amounts to "a penal (punitive) and not a civil fine[.]" We review de novo claimed infringements of constitutional rights. State v. Tiegen , 2008 S.D. 6, ¶ 14, 744 N.W.2d 578, 585.
[¶23.] Our Legislature mandates that state's attorneys "indicate on the summons, complaint, information, indictment, arrest warrant, and judgment of conviction whether the charge involves domestic abuse." SDCL 25-10-34. And, under SDCL 25-10-17.1, "the court shall order any person convicted of a crime involving domestic violence or domestic abuse to remit costs in the amount of twenty-five dollars to the clerk of courts." Id . This cost is "[i]n addition to any other penalty, assessment, or fine provided by law[.]" Id. The United States Supreme Court makes clear that its "decisions broadly prohibit judicial fact finding that increases maximum criminal 'sentence[s],' 'penalties,' or 'punishment[s]'[.]" S. Union v. United States , 567 U.S. 343, 350, 132 S.Ct. 2344, 2351, 183 L.Ed.2d 318 (2012). These terms, the Supreme Court remarked, "each undeniably embrace fines." Id. (citing Blakely v. Washington , 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) ; Apprendi v. New Jersey , 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ).
[¶24.] No fine is imposed by SDCL 25-10-17.1, so the question is whether this "cost" is constitutionally equivalent to a fine. But this question must remain undecided here; the circuit court did not impose the mandatory twenty-five dollar cost. The judgment of conviction only directs Scott to remit the standard $104 in "court costs" for the aggravated assault of Tasina and the same costs for the non-domestic abuse conviction of aggravated assault of Sonia. And the court's oral pronouncement of sentence did not impose the twenty-five dollar domestic abuse cost under SDCL 25-10-17.1. Under South Dakota law, where any ambiguity exists, "the oral sentence controls." State v. Thayer , 2006 S.D. 40, ¶ 7, 713 N.W.2d 608, 611.
[¶25.] Nonetheless, Scott contends that he is entitled to a new trial for a "jury finding regarding a domestic offense occurring." See SDCL 25-10-34. Yet Scott does not argue that an essential element of his conviction for aggravated assault requires a finding of domestic abuse. Indeed, in State v. Outka , we held that the domestic abuse notation made under SDCL 25-10-34 does not change the nature of the crime. 2014 S.D. 11, ¶ 15, 844 N.W.2d 598, 604. So the "domestic" notation in Scott's judgment and sentence did not alter his conviction for aggravated assault. Nor did it change the punishment he received. Therefore, the jury's verdict is sufficient to support the judgment of conviction.
[¶26.] Finally, Scott argues that his aggravated assault conviction pertaining to Tasina must be reversed for a new trial because the judgment and sentence with the "domestic" notation did not correspond to the jury's verdict, as the verdict made no finding on that issue. SDCL 23A-27-4 requires that "the judgment of conviction ... set forth ... the verdict or findings, *129 and the adjudication and sentence." Indeed, the circuit court did not ask the jury to decide whether the charge constituted domestic abuse. Consequently, the judgment of conviction should not have included the "domestic" notation. But because Scott's aggravated assault conviction stands independent from any supplemental finding of domestic abuse, the remedy here is not to reverse the conviction but only to remand with instructions to enter an amended judgment without the "domestic" notation.
[¶27.] Affirmed and remanded in accordance with this opinion.
[¶28.] GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.